**Shaunte DOTSON, Plaintiff,**

v.

**Officer Jamie BRAVO, Star # 4123 and the City of Chicago, Defendants.**

**No. 00 C 7352.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 22, 2001.

Susan A. Shatz, Chicago, IL, for plaintiff.

City of Chicago, Department of Law, Corporation Counsel, Chicago, IL, for defendants.

### ORDER

ROSEMOND, United States Magistrate Judge.

Before the Court is *"Defendants' Emergency Motion For Dismissal And Discovery Sanctions"*. **The motion is granted.**

*"Defendants' Emergency Motion For Dismissal And Discovery Sanctions"* is brought pursuant to Rule 37 of the *Federal Rules of Civil Procedure.* In their motion, defendants maintain that the history of the lawsuit reveals an ongoing scheme to defraud the courts, law enforcement, and the defendants *via* the plaintiff's deliberate and intentional concealment of his true identity. The true identity of the plaintiff is not "Shaunte Dotson", but rather, "DeMarco Shaunte Sheppard."[1] Defendants maintain that the plaintiff's subterfuge in this regard subverts the integrity of the judicial process and the civil justice system, and requires as a sanction therefor the dismissal of his lawsuit. To better understand the genesis of the motion, some background facts are necessary.

On February 6, 2001, plaintiff Shaunte Dotson filed his *"First Amended Complaint"*.[2] Count I is a § 1983 federal malicious prosecution claim (42 U.S.C. § 1983); Count II, a pendent state claim for malicious prosecution; and Count III, a pendent state claim for indemnification. In his amended complaint, Dotson alleged the following.

Assertedly, in the late hours of December 31, 1997 and into the morning hours of January 1, 1998, plaintiff, accompanied by a Ms. Tamika Smith, was attending Ms. Smith's birthday party and a New Years Eve party at 8529 South Saginaw. Admittedly, Dotson was "partying" and was intoxicated.[3] Shortly after midnight, Ms. Smith went outside in the backyard of the residence at 8529 South Saginaw. Allegedly, at about the same time, defendant police officer, Jamie Bravo, was investigating shots fired in the area. In so doing, he walked down the gangway of the house adjacent to the residence at 8529 South Saginaw. When he reached the end of the gangway, defendant Bravo saw Ms. Smith in the backyard of 8529 South Saginaw, and ordered her to freeze. Assertedly, defendant Bravo did not identify himself as a Chicago police officer. Ms. Smith did not freeze, and instead started walking towards the rear door of the residence with her back to Officer Bravo. Allegedly, Officer Bravo then fired two shots at Ms. Smith, striking her in the back of her right leg. Assertedly, when Officer Bravo shot Ms. Smith, she was alone, and plaintiff Dotson was inside the residence at 8529 South Saginaw. Defendants' version of the facts is that plaintiff was in the backyard with Ms. Smith, fired a shot or shots at the investigating police officer who, in turn, returned fire, and Ms. Smith was caught in the middle. In any event, continuing with the plaintiff's perspective, upon hearing the shots fired by Officer Bravo, and the screams of Ms. Smith, plaintiff Dotson left the rear of the building at 8529 South Saginaw and entered the backyard. Plaintiff went to aid Ms. Smith who was lying on the ground. Plaintiff was arrested. Admittedly, Dotson was on bond at the time of his arrest.[4]

Plaintiff Dotson was initially charged with possession of a firearm. Later, he was indicted for attempted first degree murder of a police officer and aggravated discharge of a firearm.[5] After a bench trial, Dotson was found guilty of the lesser charge of wrongfully discharging a weapon in the direction of a police officer. A motion for new trial was granted when Dotson's defense counsel learned that there was exculpatory material in an Office of Professional Standards file

---

1. For the sake of convenience, we shall continue to use the name "Dotson" to refer to the plaintiff.

2. Docket Entry No. 10. Dotson's original complaint was filed on November 21, 2000.

3. Defendants' Exhibit A, at 4, *attached to, "Defendants' Joint Reply In Support Of Their Emergency Motion For Dismissal And Discovery Sanctions."*

4. Defendants' Exhibit A, at 4, *attached to, "Defendants' Joint Reply In Support Of Their Emergency Motion For Dismissal And Discovery Sanctions."*

5. *Id.*

that was not tendered to the defense. A second trial was held. In the second trial, the state court found Dotson guilty of aggravated discharge of a firearm, and acquitted Dotson on the more serious charge of shooting at a police officer.[6] Dotson was sentenced to four years with the Illinois Department of Corrections.

Several years later, Dotson defense counsel filed a post conviction petition in state court based on newly discovered evidence, to-wit: certain audio tapes and the deposition testimony of police officers Jamie Bravo and Michael Snow. The petition was granted, and a third bench trial held. At the conclusion of the third trial, the trial judge found Dotson not guilty of all charges. Thereafter, Dotson filed the present action against Officer Bravo and the City of Chicago.

■ The present action is filed in the name of Shaunte Dotson. Shaunte Dotson is a fictitious name. Plaintiff was born DeMarco Shaunte Sheppard.[7] Arrest records for the Juvenile Justice and Child Protection Department of the State of Illinois reveal that throughout the years 1994 through 1997 whenever Dotson, as a juvenile, had any "run-ins" with the law, he truthfully disclosed his identity as DeMarco Sheppard.[8] Shaunte Dotson is a "made-up" name—a fake name—a creature of Dotson's imagination created out of self-interest and deceit. "Shaunte Dotson" cannot even be said to be an alias, because, except for the present lawsuit, there is no evidence in the record that Dotson was ever *known* as Shaunte Dotson by the relevant community prior to the date of his arrest *to-wit:* January 1, 1998, or for that matter after that date:

*It has often been held that an alias is another name by which a person is known and identified.*[9]

Chicago police department arrest records reveal that he had used the name a few times in 1997. Ms. Tamika Smith knew Dotson as DeMarco Shaunte Sheppard. On the April 10, 1999 birth certificate for her daughter Akia, Ms. Smith identifies the father of the child as "Damarco Shaunte Sheppard" with a birth date of June 24, 1980.[10] On the February 13, 1998 birth certificate of her son, Ms. Smith gives the child the first name of "Da-Marco" and the surname of "Sheppard".[11] Whether she knew DeMarco Shaunte Sheppard by the name of Shaunte Dotson prior to January 1, 1998 remains to be seen.[12]

When Dotson was arrested—rightfully or wrongfully—on January 1st, 1998 by Officer Bravo for the charged shooting incident which provided the predicate for his three state criminal trials, two convictions, sentencing, incarceration, subsequent acquittal, and present § 1983 claims, he did not use his true name of DeMarco Sheppard. From the inception of his arrest in January of 1998, Dotson deliberately and intentionally declined to use his real name, because he was a fugitive from the law and did not wish to be discovered:

*Question:* So · if your name is DeMarco Sheppard, and the police asked you on

---

6. Of course, it goes without saying, that "[m]ere acquittal on [a] criminal charge does not establish lack of probable cause". *Lindsey v. Dayton–Hudson Corp.*, 592 F.2d 1118, 1125 (10th Cir. 1979).

7. *See, Defendants' Exhibit E, "Defendants' Joint Reply In Support Of Their Emergency Motion For Dismissal And Discovery Sanctions."*

8. Group Exhibits, *attached to*, "Plaintiff Dotson's Surreply To Defendant's Emergency Motion To Dismiss".

9. *People v. Kelley*, 129 Ill.App.3d 920, 922, 473 N.E.2d 572, 573, 85 Ill.Dec. 204, 205 (3d Dist. 1985); and *People v. Gonzalez*, 313 Ill.App.3d 607, 613, 730 N.E.2d 534, 541, 246 Ill.Dec. 509, 516 (2d Dist.2000) (*"an alias is an additional name by which a person is known or identified "*).

10. *Defendants' Exhibit D, "Defendants' Joint Reply In Support Of Their Emergency Motion For Dismissal And Discovery Sanctions ".* **Dotson has, on occasion, spelled his first name as "DaMarco".** *See, e.g.,* Defendants' Exhibit A, "Defendants' Appendix Of New Evidence In Support Of Their Emergency Motion For Dismissal And Discovery Sanctions."

11. *Defendants' Exhibit C, id.*

12. It is this close association of Dotson and Ms. Smith, together with Dotson's recent identity revelation that, understandably, has made the defendants suspicious, wondering whether or not Dotson and Smith were in cahoots together regarding his identity concealment.

that day [*to-wit:* January 1, 1998], what's your name, why did you say Shaunte Dotson?

**Dotson:** Because ... *I was on the run.* I had the warrants for juvenile.

**Question:** Okay. So you gave the police a false name because you were afraid of outstanding warrants at the time, is that correct?

**Dotson:** Correct, correct.[13]

Dotson's concealment of his true identity was a *material falsehood.*[14] Dotson has never initiated any legal proceedings to change his name:

**Question:** Have you ever filed ... or has anyone filed on your behalf any court papers to legally change your name?

**Dotson:** No.[15]

Thus, on January 1st, 1998, when Dotson was arrested for possession of a firearm, he knowingly lied to law enforcement to avoid any adverse legal ramifications that might stem from his arrest while out on bond. He lied to cover-up his true identity so that his fugitive status would be unknown and undetected by law enforcement. He lied so that whatever might befall him with respect to the January 23d, 1998 Indictment for attempted first degree murder and aggravated discharge of a firearm, *to-wit:* Case No. 98 CR 218210, would not be augmented or affected in any way by his juvenile arrest records or criminal history. There can be no doubt that Dotson's conduct in this regard was an obstruction of justice.[16] Dotson continued his charade through each of his three state criminal trials, and each of his two sentencing hearings. With unabashed chutzpah, Dotson, who had successfully interfered with the administration of justice by withholding his true identity from the state and law enforcement, accused the state of withholding vital information from him. Apparently, the charge had force, because, as noted earlier, he was eventually acquitted.

Dotson had much to gain by concealing his true identity. On January 1, 1998, had Dotson identified himself as DeMarco Shaunte Sheppard, law enforcement would have known him as an active member of the Blackstone street gang, with a criminal history, who was either out on bond or a fugitive from the law, and who, by being arrested, ran the risk of being in violation of the conditions of his bond.[17] Shaunte Dotson, on the other hand, was—presumably—not a member of the Blackstone street gang, had no criminal history to speak of, was neither a fugitive from the law nor out on bond and, therefore, did not risk being a bond violator. Shaunte Dotson was a name that gave plaintiff several advantages. For example, the state prosecutors were not in a position to argue at Dotson's criminal trial that his creation of an alias at the time of his arrest reflected consciousness of guilt:

> *The use of a false name after the commission of a crime is commonly accepted as relevant on the issue of consciousness of guilt.*[18]

Throughout the state criminal proceedings, Dotson improperly enjoyed the benefits of an individual with no significant criminal history. His deception successfully frustrated law enforcement and the judicial process from learning who he was and what his background was.

Dotson continued the subterfuge in federal court when, as a non-party witness, he testi-

---

**13.** Transcript of the May 25th, 2001 Deposition of DeMarco Shaunte Sheppard, at 198, *attached as Defendants' Exhibit B to, "Defendants' Emergency Motion For Dismissal And Discovery Sanctions"* (emphasis added).

**14.** *United States v. Gaddy,* 909 F.2d 196, 199 (7th Cir.1990).

**15.** May 25th Tr., at 15. Dotson does have a common law right to change a name without a formal application. However, a common law name change is valid, only if the change does not interfere with the rights of others by serving a fraudulent purpose. *Chaney v. Civil Service Com'n,* 82 Ill.2d 289, 294, 45 Ill.Dec. 146, 412 N.E.2d 497 (1980). The record shows that Dotson has never changed his name—formally or *via* the common law. Nor could he do so given his fraudulent purposes.

**16.** *Cf., United States v. Gaddy,* 909 F.2d 196, 199 (7th Cir.1990).

**17.** Defendants' Exhibit A, at 6, *"Defendants' Joint Reply In Support Of Their Emergency Motion For Dismissal And Discovery Sanctions."*

**18.** *People v. Coleman,* 158 Ill.2d 319, 339, 633 N.E.2d 654, 665, 198 Ill.Dec. 813, 824 (Ill.1994) (emphasis added).

fied under oath in a deposition in Ms. Tamika Smith's § 1983 action and upon the filing of his own § 1983 action. Deception was Dotson's goal. He did not—as he argues—file his present lawsuit in the name of Shaunte Dotson because that was the name under which he was convicted and sentenced. Rather, as emphasized earlier, Dotson assumed the identity of "Shaunte Dotson"—a non-existent person—to thwart law enforcement and the judicial process, and he continued that deception through the filing of his lawsuit. Had he disclosed his true identity at the first reasonable opportunity in the federal proceedings, the charges of fraud now leveled against him would have less force. *However, he has not been straightforward.*

On March 22d, roughly eight months before the November 21st, 2000 filing date of Dotson's present action, then prison inmate Dotson, as a non-party witness, was deposed in the case of *Tamika Smith v. Officer J. Bravo and others*, Case No. 99 C 5077, whereupon he forego the opportunity to be truthful, and instead *swore falsely under oath* as follows:

> *Question:* Have you ever been known by any other names other than Shaunte Dotson?
>
> *Dotson:* No.
>
> *Question:* ... you haven't been known as DeMarco, something DeMarco?
>
> *Dotson:* No.[19]

City counsel's inquiry regarding whether or not Dotson had ever been known as "DeMarco something" stemmed from an interview of a witness, now deceased, who had attended the December 31st, 1997 New Year's Eve party in question, and who had advised them that he knew Dotson as "DeMarco".[20] The witness never gave a last name, so City counsel never had a last name to put to

Dotson at his deposition.[21] There is no evidence that City counsel knew anything more than what the now deceased witness told them. In any event, Dotson's mendacity demonstrates a lack of respect for the law and the judicial process.

Further *indicia* of Dotson's deliberate ongoing concealment of his true identity is the fact that in the same deposition he also *swore falsely under oath* about his date of birth:

> *Question:* Can you tell me what your date of birth is, please.
>
> *Dotson:* 6–4–80.
>
> *Question:* 6–4 what?
>
> *Dotson:* '80.[22]

When Dotson gave the above testimony, he was incarcerated and not represented by counsel. That fact does not absolve Dotson of perjury. We agree with the defendants; Dotson did not need an attorney to tell him what his real name was. Absolution might be forthcoming had Dotson at some appropriate time in these proceedings proffered some evidence suggesting a lack of intent to commit fraud on the Court or on anyone else. That scenario has never happened.

In defense of his conduct, Dotson states that he stands in the shoes of inmate Timothy Miller in the case of *James Miller v. Stanley Hoffman.*[23] Similarities do exist. For example, Dotson, like Miller, assumed another identity when he was arrested, convicted, and sentenced. *Assertedly,* Dotson, like Miller, volunteered his true identity in the lawsuit in which he was the plaintiff. As is discussed more fully hereinafter, Dotson's true identity was never truly volunteered. It was compelled by motion of the defendants, and by the extrinsic circumstance of an April 2001 arrest of Dotson, and a concurrent visit

**19.** Transcript of the March 22d, 2000 Deposition of Shaunte Dotson, at 10, *attached as Defendants' Exhibit A to, "Defendants' Emergency Motion For Dismissal And Discovery Sanctions"*. Ms. Smith's case stems from the incident underlying Dotson's arrest. Dotson is unquestionably the star witness for Ms. Smith's case. His own federal action was eventually consolidated with her's.

**20.** Official taped-recording of the June 19, 2001 proceedings before the Magistrate Judge.

**21.** *Id.*

**22.** *Id.* DeMarco Shaunte Sheppard was born on June 4, 1980. *See,* Transcript of the May 25th, 2001 Deposition of DeMarco Shaunte Sheppard in the case of *Shaunte Dotson v. Officer Jaime Bravo and others*, Case No. 00 C 7352, at 15, *attached as Defendants' Exhibit B to, "Defendants' Emergency Motion For Dismissal And Discovery Sanctions"*.

**23.** 1999 WL 415397 (E.D.Pa.1999).

to the jailhouse by one of the attorneys for plaintiff Tamika Smith. As in *Miller*, all arrest records, trial documents, conviction records, sentencing records, and acquittal papers relating to his state criminal prosecution bear the name of Dotson's assumed name.

The *Miller* court chose to ignore Miller's earlier deception in the state judicial processes, and instead, focused upon what Miller did in the case before it. Apparently, because Miller admitted that he had lied in his former criminal trial, and did not lie about his identity in the case before the *Miller* court, the *Miller* court found no fraud in the *federal* proceeding.

We agree with the *Miller* court that dismissal as a sanction would have been inappropriate in Miller's situation. The *Miller* court did not speak to Miller's deception *vis-a-vis* state law enforcement or the state judicial processes. We can only conclude that the *Miller* court was of the opinion that whatever deception that Miller engaged in with respect to the state authorities and the state judiciary was best handled by the State of Pennsylvania. As long as Miller was upfront and truthful in his federal action, his past sins—although, perhaps, not forgiven—would not be used to preclude his prosecution of a valid § 1983 claim. In other words, the *Miller* court was solely concerned with whether or not fraud had been perpetrated on the federal courts, not with any fraud that may have been perpetrated upon the state courts. No fraud on the federal courts had occurred. And, the Pennsylvania state authorities were still free to impose whatever sanctions or penalties they deemed appropriate for Miller's deception towards them.

The *Miller* court may also have engaged in an unarticulated balancing of the equities. As noted earlier, Miller admitted his former deceit. Thus, Miller's deceit did not mislead the court or the *Miller* defendants. Nor did Miller's deceit in any way handicap the discovery efforts of the defendants or in any way frustrate their ability to mount a defense to his action. It did not augment or increase the defendants' litigation expenses. The *Miller* defendants were not in any way preju-

diced by Miller's former deceit. None of the foregoing can be said with respect to Dotson.

Miller's deceit was history—it was not in any way an ***ongoing concealment.*** Miller's civil rights action was independent of and completely unrelated to the charges for which he was incarcerated. In other words, Miller's former deceit was unrelated to his civil rights action before the *Miller* court. Dotson's civil rights action, on the other hand, stems from and is predicated on the incident for which he was arrested, convicted, sentenced, and incarcerated. We need not decide whether or not we are in ***complete*** agreement with *Miller*, because we find that Dotson's shoes differ markedly from Miller's.

Dotson's present civil rights action stems from and is predicated on the factual scenario underlying his arrest, conviction, sentencing, and incarceration. His ***admitted*** deception infects those very facts and shrouds them and his present action with suspicion and taint.

It is ***admitted and undisputed*** that Dotson was not straightforward with respect to his true identity with state law enforcement and the state judicial processes.

It is ***admitted and undisputed*** that Dotson was not straightforward when he had the opportunity to be so before the United States District Court for the Northern District of Illinois in the case of *Tamika Smith v. Officer Jamie Bravo and others*, Case No. 99 C 5077, now consolidated with Dotson's action. Dotson's action was consolidated with Ms. Smith's action on December 14, 2000.[24]

Ms. Tamika Smith's civil rights action stems from and is predicated on the factual scenario underlying Dotson's arrest and eventual incarceration. It could be said that the filing of Dotson's present § 1983 action was solely for the purpose of giving him yet another opportunity to recant his ongoing deception, and thereby diffuse the ticking time bomb that concealment of his true identity posed for her case. In other words, greed and money were his motivation—not truthfulness.[25]

---

24. Docket Entry No. 68.

25. Although the closeness of the present relationship is unknown, at least in 1998 and 1999, Ms. Smith was Dotson's girlfriend. She was then and continues to be the mother of two of his children.

However, even with respect to his own action, Dotson did not "come clean" immediately or voluntarily.[26] Written interrogatories propounded by the defendants to Dotson were never answered within a reasonable time after having been served. Purportedly, the roughly two-month delay in answering was due to Dotson being "sick". When he first responded to defendants' outstanding discovery, he did not file verified answers as required by the federal discovery rules.[27] When Dotson first provided *"Answers To Defendant Bravo's Interrogatories"*, he continued to falsely identify himself as Shaunte Dotson.[28] He also gave the following false answer to Defendants' Interrogatory No. 3:

> ***Interrogatory No. 3:*** State the date and place of all arrests or ***criminal charges brought against plaintiff in the last ten years.***
>
> ***Answer:*** See Plaintiff's B of I criminal history report previously tendered by defendant City of Chicago in the *Smith* case, 99 C 5077.[29]

The above-quoted response is false and misleading because it intentionally omits relevant evidence. Shaunte Dotson knew, because he had concealed his true identity from the defendants', that Identification Section B of the City of Chicago's Department of Police Arrest Records would only have four arrests on it, because it was in the name of a nonexistent person named Shaunte Dotson who purportedly was born on June 4, 1980.[30] Dotson offers no explanation for his failure to include arrests under the name of DeMarco Shaunte Sheppard in his responses to the defendants' interrogatories. His omission can only be construed as a deliberate part of his ongoing scheme to conceal his true identity. Had he disclosed his true identity, arrests in the name of DeMarco Shaunte Sheppard would have been revealed. Equally as telling is the fact that in responding to the defendants' arrest information inquiries, Dotson omitted divulging arrests that occurred this very year.[31] Indeed, in open court, counsel for the defendants represented to the Court that Dotson had been arrested ***three*** times in the past year. It is as defendants remark ***"simply unbelievable"*** that Dotson omitted these arrests from his discovery responses.[32]

Dotson resisted being forthright. Forthrightness on his part was ***compelled*** by *"Defendant Bravo's Motion To Compel"*, which was granted with respect to these matters in open-court on May 8, 2001.[33] Even so, his forthrightness was not complete.

When Dotson re-filed his *"Answers To Defendant Bravo's Interrogatories"*, he again gave the same false and misleading answer that he had given previously.[34] This time the falsehood was even more egregious. His answers were subscribed and sworn to on May 11, 2001. He deliberately failed to include in his response to Interrogatory No. 3 the fact that he had just been arrested twelve days earlier on April 29, 2001 for allegedly discharging a stainless revolver.[35] Dotson was arrested in the name of DeMarco S. Sheppard. The *"Record Of Interviews In Lockup"* section of the police department's

---

26. Case No. 00 C 7352.

27. Rule 33(b)(2) of the *Federal Rules of Civil Procedure* requires that answers to interrogatories *"are to be signed by the person making them"* (emphasis added). Until he was ***compelled*** by motion to do so, Dotson did not sign any verification or certification of his interrogatory answers.

28. *See, e.g., Defendants' Exhibit C, "Defendants' Emergency Motion For Dismissal And Discovery Sanctions".*

29. Defendants' Exhibit C, *"Defendants' Emergency Motion For Dismissal And Discovery Sanctions"* (emphasis added).

30. Defendant's Exhibit B, *attached to,* August 8, 2001 letter by defendants to the Magistrate Judge supplementing their written submissions. The arrests run from June 14, 1997 through July 20, 1997 through August 21, 1997 through January 1, 1998. *Id.*

31. Official tape-recording of the May 8, 2001 proceedings before the Magistrate Judge.

32. Transcript of the May 8, 2001 proceedings before the Court, at 33 and 34.

33. Docket Entry No. 15 (Case No. 00 C 7352).

34. *See,* Defendants' Exhibit D, *"Defendants' Emergency Motion For Dismissal And Discovery Sanctions".*

35. Defendants' Exhibit A, *"Defendants' Appendix Of New Evidence In Support Of Their Emergency Motion For Dismissal And Discovery Sanctions."*

arrest records shows that Dotson was visited by attorney Kevin Peters, who is listed on the official docket sheets for the court, as one of the attorneys for Ms. Tamika Smith.[36] If true, there can be *no* excuse for Dotson's answer to defendants' Interrogatory No. 3 being false and incomplete for yet a second time. Particularly, since Dotson's *"Answers To Defendant Bravo's Interrogatories"* were prepared by "his attorneys, Thomas Peters and Kevin Peters." [37] Dotson's mendacious discovery responses reveals a fundamental disrespect for the judicial process. *Knowingly incomplete and misleading answers to written interrogatories constitutes perjury, as well as, fraud.*[38]

The date of Dotson's April 29th arrest has significance for yet another reason. Up until his April 29th, 2001 jailhouse meeting with attorney Kevin Peters, Dotson was completely successful in the ongoing concealment of his identity and arrest history. However, when he met with Kevin Peters, the "jig" so to speak—was up. Only after he is "cornered", and has no where to run does Dotson "cough" up his true identity. And, even then, as noted earlier, he does so lamely. Twelve days after his April 29th arrest, Dotson gives up the name DeMarco Sheppard in his *motion-compelled* verification to defendants' interrogatories.

When he finally did file the verification to his *"Answers To Defendant Bravo's Interrogatories"*, Dotson was again less than truthful. As noted earlier, his *"Certification"* was subscribed and sworn to on May 11, 2001, and reads as follows:

> I, Shaunte Dotson do hereby swear that all of the above information is true to the best of my recollection and belief. *Further,*

that I am also known as DeMarco Shaunte Sheppard.[39]

The above-quoted verification is not true. Dotson is *not* also known as DeMarco Shaunte Sheppard—*he is* DeMarco Shaunte Sheppard. In any event, Dotson's untimely response came *three days before Dotson was deposed in his own case,* three weeks before the final pretrial order was then due, and six weeks before the then trial date for the two consolidated cases. Coming as it did, just three days before his deposition, Dotson effectively precluded the defendants from having the full picture regarding his true identity and arrest history, because they had no time within which to issue any discovery requests regarding DeMarco Shaunte Sheppard. The timing of the *Verification* was strategically beneficial to Dotson. Clearly, Dotson's eleventh hour verification was but a lame attempt to climb out from under his 40–month deception before the state and federal judicial machinery, in general, and his 21–month abuse of the federal judicial process, in particular.[40]

Dotson's April 29th arrest is significant for yet another reason. At some time in the year 2001, Dotson enrolled as a student in the summer program at the Lincoln Technical Institute.[41] Presumably, registration for the summer classes was around late spring. In any event, the point is that in the Spring of 2001, whenever it suited him, Dotson used his true name of DeMarco Shaunte Sheppard. Poignantly, it did not suit him to do so with respect to his lawsuit or with a Judge of this Court. Dotson's ongoing concealment of his true identity extended to a Spring settlement conference with Magistrate Judge Keys. In February or March of 2001, in the

---

36. *Id.*

37. It is of no moment that, officially, Kevin and Tom Peters represent Ms. Smith and not Dotson. With the consolidation of Smith's and Dotson's actions, Smith and Dotson counsel have mounted a common front against the defendants, particularly, in the area of discovery. What one discovered or knew, in all likelihood the other was soon to learn. *See, e.g.,* Defendants' Exhibit D, *attached to,* "Defendants' Emergency Motion For Dismissal And Discovery Sanctions".

38. *In re Amtrak "Sunset Limited" Train Crash in Bayou Canot, Alabama on September 22, 1993,*

136 F.Supp.2d 1251, 1258 (S.D.Ala.2001) (emphasis added).

39. Exhibit D, *"Defendants' Emergency Motion For Dismissal And Discovery Sanctions"* (emphasis added).

40. Ms. Smith's § 1983 action, Case No. 99 C 5077, was filed on August 4th, 1999.

41. Dotson's May 25th, 2001 Deposition Transcript, at 37, *attached as Exhibit B to,* "Defendants' Emergency Motion For Dismissal And Discovery Sanctions."

consolidated cases of *Tamika Smith v. Officer J. Bravo and others,* Case No. 99 C 5077 and *Dotson v. Bravo and others,* Case No. 00 C 7352, the parties and their respective counsel met with Magistrate Judge Keys in an effort to resolve the two cases. Obviously, the defendants prepared for and participated in the conference without the benefit of knowing Dotson's true identity. Dotson did not take this opportunity to be straightforward in either his case or Ms. Smith's, and reveal his true identity. Rather, he willingly chose to continue his deceit, and permit Magistrate Judge Keys to prepare for and conduct the settlement conference under false pretenses. No settlement was reached.

Dotson impeded defendants' discovery efforts regarding his identity and arrest history at every juncture until his May 25, 2001 deposition. It was not until his deposition in his case that Dotson gave his correct birth date. ***Up until his May 25th deposition, all information about Dotson continued to be false,*** to-wit: "Shaunte Dotson is also known as DeMarco Shaunte Sheppard, with a birth date of June 4th, 1980." As noted earlier, all of the foregoing is false.

It is true—as defendants contend—that the above verification only came after it was ***compelled.*** Ostensibly, it was compelled by *"Defendant Bravo's Motion To Compel"* and the Court's grant of that motion.[42] However, it appears that Dotson's disclosure was also compelled by external forces at work. The bottom line is that it was never voluntary. Presumably, Dotson's April 29, 2001 jailhouse meeting with attorney Kevin Peters was the first time that an "officer of the court" connected with the consolidated action learned of Dotson's true identity. As noted earlier, the April 29th arrest was in the name of DeMarco Sheppard.

Defendants argue that because their interrogatories included questions concerning his arrest history, Dotson intentionally submitted unverified answers because he knew that his answers omitted all arrests under the name of DeMarco Sheppard. In other words, it was a deliberate omission in an effort to frustrate defendants' ability to investigate him. Given the record as a whole, their argument has substantial force.

Dotson's deception has been prejudicial to the defendants in terms of energy, manpower, and money. Defendants' discovery conducted for Shaunte Dotson essentially only revealed the criminal history associated with the arrest underlying Dotson's and Ms. Smith's civil rights actions.[43] According to defendants, when they "incurred the expenses and time of issuing subpoenas for Dotson's employment, school, and governmental/social services records, the entities to whom these subpoenas were directed responded that they had no records under the name Shaunte Dotson."[44] Because of the deceit, defendants' discovery led to nothing. In contrast, defendants note that in the limited time period since learning of Dotson's real identity, they have uncovered a lengthy arrest history, albeit most such arrests appear to have occurred when Dotson was a juvenile. However, included amongst such newly discovered arrests was an arrest for possessing a handgun on New Year's Eve, an act markedly identical to that for which he was criminally charged in the incident underlying the present lawsuit.[45] Three other arrests in the past ten months were also discovered.[46] Without a doubt, Dotson's deception has hampered the defendants' discovery efforts to learn about a complaining party who seeks substantial damages from them. Dotson's deception has also unreasonably and vexatiously increased the defendants' litigation costs.[47]

■ ***Defendants charge that Dotson's ongoing concealment of his true identity and arrest history is a fraud on the court.*** *"Fraud on the court"* is a somewhat nebulous concept.[48] Adopting Professor Moore's definition, the United States Court of Ap-

---

42. Docket Entry No. 15 (Case No. 00 C 7352).

43. *See, "Defendants' Emergency Motion For Dismissal And Discovery Sanctions",* at 6.

44. *Id.*

45. *Id.*

46. *Id.*

47. *See generally,* 28 U.S.C. § 1927, which condemns parties who unreasonably and vexatiously multiply litigation costs and attorneys fees.

48. *Demjanjuk v. Petrovsky,* 10 F.3d 338, 352 (6th Cir.1993).

peals for the Sixth Circuit defines it as follows:

> Fraud upon the court should ... embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication, and relief should be denied in the absence of such conduct.[49]

Succinctly stated, fraud on the court requires an intent to deceive or defraud the court,[50] and "involves circumstances where the impartial functions of the court have been directly corrupted."[51] Courts distinguish "fraud upon the court" from fraud on an adverse party, and reserve the former "to fraud which seriously affects the integrity of the normal process of adjudication."[52] Cases dealing with fraud on the court often turn on whether the egregious conduct is that of the parties alone, or if the attorneys in the case are involved.[53] Fraud on the court is more serious than fraud on the litigants.[54] Whatever else it embodies, fraud on the court "is not fraud between the parties or fraudulent documents, false statements or perjury."[55] Indeed, "courts have uniformly held that *perjury of a single witness,* false evidence (in the absence of attorney involvement) or *mere nondisclosure* are insufficient to establish fraud upon the court."[56] Fraud

on the court is generally thought of as conduct that corrupts "the judicial process itself, as where a party bribes a judge or inserts bogus documents into the record."[57]

***The "fraud on the court" concept is construed very narrowly by the courts.*** As noted above, it involves a particular type of fraud which is "directed to the judicial machinery itself."[58] It is reserved for those situations where the court or a juror has been corrupted or influenced or where a judge has otherwise not performed his judicial functions impartially.[59] Also included under the guise of fraud on the court are those situations where attorneys, as officers of the court, have violated their duty of honesty to the court.[60]

Dotson argues that he has not committed a "fraud on the court." As that term of art is widely understood by the courts, he is correct. However, that observation, does not make his misconduct any the less egregious or any the less fraudulent. And, it does not mean that we are without any appropriate remedy for his fraudulent conduct.

As courts have recognized, the mere filing of a civil lawsuit has significant effects on a defendant.[61] The public charges made in a civil lawsuit cast a shadow over a defendant's integrity and reputation.[62] A civil lawsuit can lead to adverse publicity and can require defendants to disclose publicly certain information that they might prefer to keep pri-

---

49. *Id.*

50. *Robinson v. Audi Aktiengesellschaft,* 56 F.3d 1259, 1267 (10th Cir.1995).

51. *In the Matter of Whitney–Forbes, Inc.,* 770 F.2d 692, 698 (7th Cir.1985).

52. *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988).

53. *Demjanjuk,* 10 F.3d, at 352.

54. *Oxxford Clothes XX, Inc. v. Expeditors Int. of Washington, Inc.,* 127 F.3d 574, 578 (7th Cir. 1997).

55. *Bulloch v. United States,* 763 F.2d 1115, 1118 (10th Cir.1985) (*en banc* ).

56. *Browning v. Navarro,* 826 F.2d 335, 345 n. 12 (5th Cir.1987) (emphasis added). *See also, Gleason v. Jandrucko,* 860 F.2d 556, 560 (2d Cir. 1988) (*"[N]either perjury nor nondisclosure, by*

*itself, amounts to anything more than fraud involving injury to a single litigant.")*.

57. *Oxxford Clothes XX, Inc. v. Expeditors International of Washington, Inc.,* 127 F.3d 574, 578 (7th Cir.1997).

58. *In the Matter of Whitney–Forbes, Inc.,* 770 F.2d 692, 698 (7th Cir.1985), *quoting, Bulloch v. United States,* 721 F.2d 713, 718 (10th Cir.1983).

59. *Bulloch,* 763 F.2d, at 1118.

60. *Id. See also, H.K. Porter Company, Inc. v. The Goodyear Tire & Rubber Co.,* 536 F.2d 1115, 1119 (6th Cir.1976) (*"Since attorneys are officers of the court, their conduct, if dishonest, would constitute fraud on the court "*).

61. *Doe v. Indiana Black Expo, Inc.,* 923 F.Supp. 137, 141 (S.D.Ind.1996).

62. *Id.*

vate.[63] Basic fairness requires that where a plaintiff makes public accusations, he should stand behind those accusations.[64]

Lawsuits are public events and the public has a legitimate interest in knowing the pertinent facts.[65] Among the pertinent facts is the identity of the parties.[66]

*"Defendants' Emergency Motion For Dismissal And Discovery Sanctions"* concerns a plaintiff who never stood behind his accusations until he was *compelled* to do so by judicial intervention.[67] The motion concerns a plaintiff who accused the defendants of having maliciously lied in connection with their efforts to frame him for a crime that he allegedly did not commit, and thereafter continued their deceit in a cover-up with respect to the matter, but who, himself, from the outset engaged in and continued to engage in an ongoing fraudulent concealment of his true identity. Indisputable proof clearly and convincingly demonstrates that Dotson deliberately planned and carefully executed a scheme to deceive state law enforcement and the state judicial machinery, and that he continued this deceit through lies, misrepresentation, and non-disclosure in federal court.

■ *Rule 37 of the Federal Rules of Civil Procedure addresses a litigant's failure to comply with discovery requirements.* The rule "provides for the imposition of sanctions against a party that fails to make disclosure or cooperate in discovery." [68] Under the rule, when a party engages in abusive and obstructive discovery tactics by failing to properly respond to discovery requests in any way, the court may impose sanctions directly, without first issuing an order to compel discovery. The federal discovery rules give ample notice to litigants regarding how to properly conduct themselves.[69] In a discovery disclosure system, designed to operate insofar as possible without judicial intervention, issuance of a court order in the first instance is unnecessary before a violation of the rule can be found.

■ Under Rule 37(b) and (c) of the rules, a court may dismiss an action for severe discovery abuses. Giving perjurious answers during a deposition and in interrogatory responses will support a Rule 37 sanction of dismissal *with prejudice.*[70]

*"Lying cannot be condoned in any formal proceeding."*[71] As emphasized by the United States Supreme Court,

> False testimony in a formal proceeding is intolerable. We must neither reward nor condone such a "flagrant affront" to the truth-seeking function of adversary proceedings.[72]

The "basic purpose of a trial is the determination of truth." [73] Litigants who wish to use the judicial system to settle disputes have certain obligations and responsibilities in this regard:

*One of those responsibilities is to tell the truth in a deposition.*[74]

Toleration of perjury is unseemly—it undermines and dishonors the legal system, and

---

63. *Indiana Black Expo, Inc.*, 923 F.Supp., at 141.

64. *Id.*

65. *Free Market Compensation v. Commodity Exchange, Inc.*, 98 F.R.D. 311, 312 (S.D.N.Y.1983).

66. *Id.*

67. By *Minute Order* dated May 8, 2001, the Court granted *"Defendant Bravo's motion to compel"* as to this matter. Docket Entry No. 15 (Case No. 00 C 7352).

68. *Quela v. Payco–General American Credits, Inc.*, 2000 WL 656681 * 6 (N.D.Ill. March 26, 2000). Although the language of Rule 37(b) requires violation of a judicial order in order to impose sanctions, a formal, written order to comply with discovery is not required, where a litigant engages in abusive litigation practices. *Id. See generally, Halas v. Consumer Services, Inc.*, 16 F.3d 161, 164 (7th Cir.1994) ("a formal written order to comply with discovery requests is not required under Rule 37(b)").

69. *Hal Commodity Cycles Management v. Kirsh*, 825 F.2d 1136, 1139 (7th Cir.1987).

70. *Quela*, 2000 WL 656681, at * 6 (emphasis added).

71. *Id.*

72. *ABF Freight Sys. Inc. v. National Labor Relations Bd.*, 510 U.S. 317, 323, 114 S.Ct. 835, 839, 127 L.Ed.2d 152 (1994).

73. *Tehan v. Shott*, 382 U.S. 406, 416, 86 S.Ct. 459, 465, 15 L.Ed.2d 453 (1966).

74. *Rodriguez v. M & M/Mars.*, 1997 WL 349989 * 2 (N.D.Ill. June 23, 1997).

undermines and dishonors the courts, themselves.[75]

■ Trial judges are accorded considerable latitude in dealing with serious abuses of the judicial process. Dismissal as a sanction is reserved for instances where the offending party's misconduct is egregious.

■ In determining whether dismissal is appropriate, a trial "judge should carefully balance the policy favoring adjudication on the merits with competing policies such as the need to maintain institutional integrity and the desirability of deterring future misconduct." [76]

Dotson argues that dismissal of his action is an inappropriate sanction for three reasons. *First,* his misconduct did not cause the defendants any prejudice. *Second,* he made no false statements in his own case. This contention we summarily reject, because, as we have already demonstrated, it is blatantly untrue. *Third,* impeachment at trial is the appropriate sanction for his misconduct, not dismissal. We reject all of his contentions.

Dotson argues that the defendants have not been prejudiced by his misconduct for three reasons. *First,* now that they know who he really is, they have all of the discovery that they could possibly obtain under the name of DeMarco Shaunte Sheppard. There is nothing more for them to discover. *Second,* most of the discovery that they have recently obtained relating to DeMarco Shaunte Sheppard they cannot use in any event, because they are juvenile records and, therefore, inadmissible as evidence. *Third,* Dotson maintains that his misconduct has not hurt or prejudiced the defendants, but quite the contrary, it has enhanced their defense against him. It has given the defendants several areas of impeachment.

We summarily reject the second argument. Whether inadmissible or not, the defendants were entitled to discovery regarding Dotson's true identity and his arrest history. In any

event, even if the juvenile arrest records are not admissible, the April 2001 arrest and the other arrests occurring within the past year might be. Arguably, the arrest history discovery might be relevant to issues of motive, intent, mistake, or knowledge.

With respect to the first argument, we reject that as well. Defendants were prejudiced, because they were denied their right to conduct full discovery and have honest and complete information from an opposing party during the course of discovery.[77] They were prejudiced, because Dotson's deceit impeded their ability to fully present a defense against him. In other words, the defendants have not been allowed to defend Dotson's action (or for that matter Ms. Smith's) on a level playing field.

***Dotson's deceit has hindered and impeded the orderly and speedy progression of the case*** by diverting the defendants' attention from their primary mission of defending Bravo and the City on the merits, and encouraging them to devote considerable time and energy pursuing collateral credibility issues regarding Ms. Smith as well as Dotson, himself. Defendants seek to redepose Ms. Smith regarding this matter. Undoubtedly, defendants will propound additional paper discovery on both Ms. Smith and Dotson with respect to the matter. All of which is understandable under the circumstances. As stressed by the United States Supreme Court,

> In any proceeding, whether judicial or administrative, deliberate falsehoods "well may affect the dearest concerns of the parties before a tribunal," *** and may put the factfinder and parties "to the disadvantage, hindrance, and delay of ultimately extracting the truth by cross examination, by extraneous investigation or other collateral means." *** ***Perjury should be severely sanctioned in appropriate cases.***[78]

Dotson's ongoing fraudulent concealment of his identity and arrest history has delayed the truth-finding processes herein, and initi-

**75.** *ABF Freight Sys., Inc.,* 510 U.S., at 326, 114 S.Ct., at 841, (Justice Scalia, with whom Justice O'Connor joins, concurring in the judgment).

**76.** *Aoude,* 892 F.2d, at 1118.

**77.** *In re Amtrak "Sunset Limited" Train Crash in Bayou Canot, Alabama on September 22, 1993,* 136 F.Supp.2d, at 1261.

**78.** *ABF Freight System, Inc. v. N.L.R.B.,* 510 U.S. 317, 323, 114 S.Ct. 835, 839, 127 L.Ed.2d 152 (1994).

ated investigations into collateral credibility issues. Credibility is always an issue in any action. However, now the credibility issues, particularly, in the case of Ms. Smith, have little to do with her § 1983 action, and everything to do with the side issue of whether or not she was a part of Dotson's ongoing fraudulent scheme.

*Credibility and veracity issues are among the ultimate factually disputed issues in a trial, and are not to be resolved beforehand or otherwise be used as a basis for a sanction.*[79] Admitted perjury, however, is quite another matter. The fact is that whether or not Officer Bravo's testimony under oath in prior state court proceedings or in these proceedings is inconsistent, contradictory, or in any way false remains to be determined by a trier of fact. Dotson has to *prove* before a jury of his peers that Officer Bravo is a prevaricator. Dotson, on the other hand, is an *admitted* perjurer. The record is clear beyond any doubt whatsoever that he deliberately planned and schemed to conceal his true identity and arrest history from state authorities and from the litigants in the case of *Smith v. Bravo*, Case No. 99 C 5077, and from the defendants in his own case of *Dotson v. Bravo*, Case No. 00 C 7352. Defendants need prove nothing with respect to this matter. No jury need make any factual determination regarding the matter. The only issue is whether Dotson will be permitted to profit from his deceit.

*Dotson's arrest history is relevant to the issue of damages.* Although his complaint has no specific count for such, the parties are in apparent agreement that Dotson seeks substantial damages for the intentional infliction of mental anguish. Defendants' have every right to discover what his life was like before and after the arrest at issue. In determining damages, the trier of fact must be able to weigh and consider Dotson's life before and after his arrest. Dotson's ongoing deceit regarding his true identity and arrest history handicapped the defendants in putting forth a defense to his damages demand.

The discovery that Dotson sought to hide from the defendants clearly has impeachment value. The foregoing are but a few of the ways in which the defendants have been harmed. The bottom line is that all of the ways in which defendants have been prejudiced are not readily discernable.

Additionally, Dotson's deceit multiplied the defendants' litigation expenses unnecessarily.[80] They have had to distribute additional discovery requests for DeMarco Shaunte Sheppard. Had Dotson disclosed his true identity at the outset, defendants could have propounded discovery requests containing both names. In a sense, they have now been required to do double work, and incur double costs.

We recognize that some courts have concluded that being forced to expend more money to conduct additional depositions is not prejudice. These courts have reasoned that litigants forced to incur additional litigation expenses as a result of perjury occurring in the course of discovery can be made whole for the additional money that they were forced to expend by an appropriate award of costs and attorneys' fees.[81] Without deciding whether their perspective on this issue is correct or not, we conclude that prejudice exists in this case, because an award of attorneys fees against Dotson is not an appropriate sanction on this record. For one reason, Dotson has no money. A monetary assessment of attorneys' fees and costs leveled against him would be meaningless. For all practical purposes, Dotson is judgment-proof.[82] Accordingly, given our factual scenario, we find and conclude that the defendants have indeed been prejudiced.

79. *See, Bower v. Weisman*, 674 F.Supp. 109, 111 (S.D.N.Y.1987).

80. *G. Heileman Brewing Co., Inc. v. Joseph Oat Corp.*, 848 F.2d 1415, 1421 and 1422 (7th Cir. 1988) (trial judges may sanction parties and attorneys who litigate vexatiously).

81. *See, e.g., Bower v. Weisman*, 674 F.Supp. 109, 112 (S.D.N.Y.1987).

82. Defendants seek "at a minimum, *in addition to dismissal* [an order directing Dotson to] pay for all attorneys' fees and costs relating to any discovery conducted under false pretenses, including but not limited to all records subpoenas, plaintiff's deposition, the time and expense of bringing the motion to compel, conducting necessary follow-up discovery, and other efforts to conduct discovery under plaintiff's fake name". *"Defendants' Emergency Motion For Dismissal And Discovery Sanctions"*, at 9 and 10. Defen-

Dotson also argues that dismissing his action is grossly unfair given the inconsistencies, contradictions, and outright lies made by Officer Bravo throughout the state criminal proceedings, and in the proceedings before this Court. Although Dotson maintains that Officer Bravo has committed perjury, he proffers absolutely no proof whatsoever of his assertions in this regard. He has never been precluded from making such an offer of proof.

■ Dotson's arguments also miss the point. His conduct was fraudulent and egregious. Had he been wholly successful, instead of only partially successful, he would have completely foreclosed to the defendants the opportunity to have a fair and complete trial. His conduct interfered with and obstructed the "judicial process"—a process which *"clearly includes a party's right to full, complete, and truthful discovery."* [83] In situations of fraudulent and egregious misconduct—misconduct which goes to the heart of the triable issues in the case and which concurrently affects the orderly administration of justice and the dignity of the courts, the defendants need not quantify their harm or prejudice. Willful deceit and conduct otherwise utterly inconsistent with the orderly administration of justice is prejudicial, if, as here, the deceit relates to the merits of the controversy. The harm to the defendants must be presumed because it is intrinsic to our truthfinding adversary system and, therefore, is intangible and immeasurable. The defendants have a right to expect that if they abide by the rules, the opposing party will also. As noted by the United States Court of Appeals for the Seventh Circuit,

There is no question that procedural rules are important and that infractions of those rules should not be tolerated by the courts. Otherwise, the rules themselves will not be taken seriously, and eventually they may exist in name only, honored in the breach. [84]

Litigants should not be permitted to cheat.

*"Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts."* [85] Dotson seriously violated the "rules of the game", and he can't be permitted to say "oops, you've caught me", and thereafter be allowed to continue to play the game:

[When courts] find deliberate falsehoods told in proceedings, [they] cannot allow such conduct to go unchecked. Turning a blind eye to false testimony erodes the public's confidence in the outcome of judicial decisions, calls into question the legitimacy of courts, and threatens the entire judicial system. [86]

Incredulously, Dotson argues that he should not be faulted if law enforcement did not do its "job", and City counsel did not avail themselves of all of the discovery resources available to them. Dotson maintains that if law enforcement had endeavored to trace his true identity through his fingerprints his deception would have been short-lived. Likewise, argues Dotson, if City counsel had availed themselves of Chicago Police Department fingerprint records, they would have discovered his deception at the outset. We summarily reject these arguments as well. As emphasized above, *"[o]ur entire civil justice system is dependent on accurate and truthful discovery."* [87] The "importance of accurate and truthful discovery to the civil

dants also seek "attorneys' fees and costs for bringing this [emergency] motion, and for any cost incurred in the delay of this litigation." *Id.* Defendants ask for too much. On the other hand, an award of attorneys' fees and costs incurred in connection with the May 4th, 2001 motion to compel (Docket Entry No. 13 for Case No. 00 C 7352); along with the costs of follow-up discovery under the name of DeMarco Shaunte Sheppard, including an additional deposition of Ms. Smith; and attorneys' fees and costs associated with the instant motion would be an appropriate, but empty award, given Dotson's low-income status. Such a substantial award would also be unfair, because it would adversely affect

Dotson's ability to provide for his innocent infant children.

83. *In re Amtrak*, 136 F.Supp., at 1267 (emphasis added).

84. *Kovilic Construction Co., Inc. v. Missbrenner*, 106 F.3d 768, 770 (7th Cir.1997).

85. *Quela v. Payco–General American Credits, Inc.*, 2000 WL 656681 * 7 (N.D.Ill. March 26, 2000).

86. *Quela, Id., citing*, Lisa C. Harris, *Perjury Defeats Justice*, 42 Wayne L.Rev. 1755, 1756 (1996).

87. *Quela, Id.* (emphasis added).

justice system cannot be overstated."[88] The defendants were entitled to believe that Dotson's discovery responses were truthful.

 *Trial courts have the inherent power to fashion and impose appropriate sanctions for conduct which abuses the judicial process.*[89] The trial court's inherent powers exist even where procedural rules govern the same conduct.[90] "When a litigant's conduct abuses the judicial process, dismissal of a lawsuit is a remedy within the inherent power of the court."[91] "This power is organic, without need of a statute or rule for its definition, and it is necessary to the exercise of all other powers."[92] Because of their potency, inherent powers must be exercised with restraint and discretion, and discretion in sanctioning litigants is not unfettered.[93]

 *Dismissal with prejudice, while drastic, is an appropriate remedy under the inherent power of the court to curb abuse of the judicial process.*[94] Dismissal may be ordered as a sanction upon a finding of bad faith, willfulness, or fault.[95] "Bad

faith" is conduct which is either intentional or in a reckless disregard of a party's obligations.[96] *Dotson's "perjury is obvious bad faith."*[97] Although dismissal is a harsh sanction, the inherent power to do so is essential to a trial court's ability to manage effectively its heavy caseload and to protect effectively the interests of all litigants.[98] Because dismissal with prejudice is such a harsh sanction, it should only be employed in extreme situations, such as where there is a clear record of contumacious conduct.[99]

*The law favors trials on the merits.*[100] However, a litigant's right to such a trial is not absolute. As noted earlier, litigants who use the judicial process have certain obligations and responsibilities under the *Federal Rules of Civil Procedure*, in particular, and the integrity of the judicial process in general.[101] As recently noted by Judge Keys of this Court, there is zero tolerance for litigants who seek to intentionally distort the discovery process.[102]

*Dismissal is an appropriate sanction for giving false interrogatory responses.*[103] A

---

**88.** *Id.*

**89.** *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43–46, 111 S.Ct. 2123, 2132–2133, 115 L.Ed.2d 27 (1991); *Barnhill v. United States,* 11 F.3d 1360 (7th Cir.1993); and, *Brady v. United States,* 877 F.Supp. 444, 452 (C.D.Ill.1994). *See also, United States v. Frank,* 520 F.2d 1287, 1292 (2d Cir. 1975) ("the powers of a court to prevent intrinsic fraud on it are very great indeed.").

**90.** *Chambers,* 501 U.S., at 49, 111 S.Ct., at 2135.

**91.** *Martin v. DaimlerChrysler Corp.,* 251 F.3d 691, 694 (8th Cir.2001); *Keefer v. Provident Life & Accident Ins. Co.,* 238 F.3d 937, 941 (8th Cir.2000).

**92.** *United States v. Shaffer Equip. Co.,* 11 F.3d 450, 461 (4th Cir.1993), *citing, Chambers,* 501 U.S., at 43, 111 S.Ct., at 2132; *Brady,* 877 F.Supp., at 452.

**93.** *Chambers,* 501 U.S., at 43, 111 S.Ct., at 2132; *Marrocco v. General Motors Corp.,* 966 F.2d 220, 223 (7th Cir.1992); and, *Brady,* 877 F.Supp., at 452.

**94.** *Bogdan v. Eggers,* 2000 WL 1847608 * 10 (N.D.Ill.2000).

**95.** *National Hockey League v. Metropolitan Hockey Club,* 427 U.S. 639, 640, 96 S.Ct. 2778, 2779, 49 L.Ed.2d 747 (1976); and, *Societe Internationale v. Rogers,* 357 U.S. 197, 212, 78 S.Ct. 1087, 1096, 2 L.Ed.2d 1255 (1958).

**96.** *Marrocco,* 966 F.2d, at 224.

**97.** *Bower v. Weisman,* 674 F.Supp. 109, 112 (S.D.N.Y.1987) (emphasis added).

**98.** *Roland v. Salem Contract Carriers, Inc.,* 811 F.2d 1175, 1178 (7th Cir.1987) *See also, Link v. Wabash R.R. Co.,* 370 U.S. 626, 630–31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962).

**99.** *Marrocco,* 966 F.2d, at 224, *citing, Webber v. Eye Corp.,* 721 F.2d 1067, 1069 (7th Cir.1983). *See also, Powers v. Chicago Transit Authority,* 890 F.2d 1355, 1362 (7th Cir.1989).

**100.** *C.K.S. Engineers, Inc. v. White Mountain Gypsum Co.,* 726 F.2d 1202, 1206 (7th Cir.1984).

**101.** *Brady v. United States,* 877 F.Supp. 444, 452 (C.D.Ill.1994).

**102.** *Bogdan v. Eggers,* 2000 WL 1847608 * 12 (N.D.Ill.2000). *An action may be dismissed for discovery violations. Archibeque v. Atchison, Topeka & Santa Fe R.R. Co.,* 70 F.3d 1172, 1174 (10th Cir.1995), *citing, Ehrenhaus v. Reynolds,* 965 F.2d 916, 920 (10th Cir.1992).

**103.** *Cf., Combs v. Rockwell Internat'l Corp.,* 927 F.2d 486, 488 (9th Cir.1991) ("Falsifying evidence is grounds for the imposition of the sanction of dismissal.").

court's inherent powers may be called upon to redress such mendacity.[104] The *"gravest consequence of lying under oath is the affront to the law itself."* [105] Through lies, misrepresentation, and non-disclosure, Dotson has willfully engaged in a pattern of obstructive discovery tactics in an effort to deny defendants the means to effectively mount a defense to his accusations against them. He cannot be permitted to profit from his misconduct:

> The principle that a *perjurer* should not be rewarded with a judgment—even a judgment otherwise deserved—where there is discretion to deny it, has a long and sensible tradition in the common law. The "unclean hands" doctrine "closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." [106]

Dismissal "is permissible only when the deception relates to matters in controversy in the action, and even then is so harsh a remedy that it should be imposed only in the most extreme circumstances." [107] Dotson's misconduct is neither minor nor non-merit related. *It threatened to interfere with the rightful decision of the case* and, therefore, a lesser sanction simply will not suffice.

■ *Perjury clearly qualifies as a willful deceit of the court.*[108] Until discovered, it infects all of the pretrial procedures, and interferes "egregiously with the court's administration of justice." [109] Acts of perjury seriously undermine the very core of the judicial system:

The presence of perjury in litigation emasculates justice and deprives the opposing party of a fair trial. The public interest in the integrity of the judicial system is preserved by the dismissal with prejudice of plaintiff's claims.[110]

The record unequivocally reveals that Dotson intentionally and willfully provided false and misleading answers on a continual basis during the discovery process, and that he also committed perjury. The record as a whole dictates dismissal, *with prejudice*, as the only reasonable sanction for Dotson's deceit.

■ Dismissal of a lawsuit need not be preceded by other, less drastic sanctions.[111] A "trial court is permitted to say, under proper circumstances, that enough is enough." [112] A trial court's choice between dismissal and lesser sanctions is a product of three considerations, *to-wit:* (1) prejudice to the defendant; (2) prejudice to the judicial system; and (3) deterrence and punishment.[113] Prejudice to the defendants, and prejudice to the integrity of the judicial process has been amply demonstrated. The only question is what deterrent message is appropriate.

Dotson maintains that the only sanction appropriate on this record is impeachment. Impeachment has little punitive or deterrent effect for obstructive discovery tactics or perjury. Dismissal, *with prejudice*, will have the appropriate deterrent effect. Dismissal will send a strong message to other litigants who abuse the discovery process and who perjure themselves that such misconduct will not be condoned by the courts:

> Permitting this lawsuit to proceed would be an open invitation to abuse the judicial

**104.** *Id.*

**105.** *ABF Freight Sys., Inc. v. N.L.R.B.*, 510 U.S. 317, 326, 114 S.Ct. 835, 840, 127 L.Ed.2d 152 (1994) (Justice Kennedy concurring) (emphasis added).

**106.** *Id.* at 329, 330, 114 S.Ct. 835 (Justice Scalia, with whom Justice O'Connor joins, concurring in the judgment), *quoting, Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945).

**107.** *Bower v. Weisman*, 674 F.Supp. 109, 112 (S.D.N.Y.1987).

**108.** *TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir.1987).

**109.** *Id.*

**110.** *In re Amtrak*, 136 F.Supp.2d., at 1269.

**111.** *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir.1989).

**112.** *Pyramid Energy, Ltd. v. Heyl & Patterson, Inc.*, 869 F.2d 1058, 1062 (7th Cir.1989).

**113.** *Schilling v. Walworth County Park & Planning Com'n*, 805 F.2d 272 (7th Cir.1986), *noting, Shea v. Donohoe Const. Co., Inc.*, 795 F.2d 1071 (D.C.Cir.1986).

process. Litigants would infer [that] they have everything to gain, and nothing to lose, if manufactured evidence merely is excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means.[114]

Tempering with the administration of justice must be shown to bring about the severest of consequences. Otherwise, the institutions of justice will appear to be impotent and helpless. Dismissal, *with prejudice*, will send a resounding message to other litigants, who scheme to abuse the discovery process and lie to the Court, that this behavior will not be tolerated and will be severely punished.

■ *Under Rule 41(b), a court may dismiss an action with prejudice for a plaintiff's failure to comply with the Federal Rules of Civil Procedure.*[115] Dotson had no basis whatsoever for using a fake name throughout this litigation except to frustrate the judicial process in an effort to recover monetarily at any cost, including committing perjury and defrauding the court and the defendants. Dotson's pervasive and ongoing concealment of his true identity has immeasurably harmed the defendants and, momentarily, made a spectacle of the truth-finding processes of the courts. In so doing, Dotson violated the spirit and letter of the federal discovery rules, particularly, **Rule 10(a)** ("In the complaint, the title of the action shall include the name of all the parties"); **Rule 17(a)** ("Every action shall be prosecuted in the name of the real party in interest"); **Rule 26(e)** (a party is under a duty to supplement or correct prior discovery disclosures when necessary to make such disclosures accurate); **Rule 30(d)** (parties are not to impede, delay, or otherwise frustrate the fair examination of a deponent); and, **Rule 33(b)** (answers to written interrogatories are to be signed by the person making them). The evidence of his deceit and his rule violations is crystal-clear. Because of his deceit in this regard, he has forfeited his right to prosecute his action.

*Accordingly, it is adjudged, decreed, and ordered as follows:*

1. *"Defendants' Emergency Motion For Dismissal And Discovery Sanctions"* is granted.

2. Dismissal, *with prejudice*, is ordered pursuant to the Court's powers under Rule 37 of the *Federal Rules of Civil Procedure* for his persistence in failing to properly and truthfully respond to discovery requests, and for otherwise willfully engaging in obstructive discovery tactics.

3. Dismissal, *with prejudice*, is ordered pursuant to the Court's inherent powers to preserve the integrity and dignity of the judicial process, protect the orderly administration of justice, manage and police the conduct of the litigants before it, and to ensure compliance with the federal discovery rules.

4. Dismissal, *with prejudice*, is ordered pursuant to Rule 41(b) of the *Federal Rules of Civil Procedure* for the plaintiff's deliberate and persistent failure to identify himself and for engaging in a pattern of obstructive discovery tactics designed and intended to impair and inhibit defendants' discovery of his identity and arrest history. Dotson's conduct violates the spirit and letter of the federal discovery rules, specifically, **Rule 10(a)** ("In the complaint, the title of the action shall include the name of all the parties"); **Rule 17(a)** ("Every action shall be prosecuted in the name of the real party in interest"); **Rule 26(e)** (a party is under a duty to supplement or correct prior discovery disclosures when necessary to make such disclosures accurate); **Rule 30(d)** (parties are not to impede, delay, or otherwise frustrate the fair examination of a deponent); and, **Rule 33(b)** (answers to written interrogatories are to be signed by the person making them).

*So Ordered.*

---

114. *Brady v. United States*, 877 F.Supp. 444, 453 (C.D.Ill.1994), *quoting, Pope v. Federal Exp. Corp.*, 138 F.R.D. 675, 683 (W.D.Mo.1990), *affirmed in part, vacated in part on other grounds, Pope v. Federal Exp. Corp.*, 974 F.2d 982 (8th Cir.1992).

115. *Roland v. Salem Contract Carriers, Inc.*, 811 F.2d 1175, 1177 (7th Cir.1987); *Schilling v. Walworth County Park & Planning Com'n*, 805 F.2d 272, 275 (7th Cir.1986); *Webber v. Eye Corp.*, 721 F.2d 1067, 1069 (7th Cir.1983).